## TED HUNT v. STATE.

No. A-10414.   July 25, 1945.

(161 P. 2d 82.)

Sam J. Goodwin, of Pauls Valley, for plaintiff in error.

Randell S. Cobb, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, J.   The defendant, Ted Hunt, was charged in the district court of Garvin county with the crime of

murder; was tried, convicted of manslaughter in the first degree, and sentenced to serve 22 years in the State Penitentiary, and has appealed.

Two propositions are presented in the brief of the defendant: (1) The judgment is contrary to the law and to the facts. (2) The punishment assessed is excessive.

In the afternoon of August 4, 1942, the defendant, Ted Hunt, age 31, killed Homer Lail, age 36, in a camp ground near the town of Maysville, in Garvin county. Lail was struck by a bullet fired from a .38 caliber pistol over the right eye, causing instantaneous death. Both of the men were day laborers and during the harvest season for many years had traveled about over the country working in the harvest. A brother of the defendant had married the mother of the deceased.

The proof showed that the defendant and the wife of the deceased had been writing letters to each other. The deceased could neither read nor write. In the latter part of June, 1942, over a month before the homicide, the deceased had been told by one of his brothers that the wife of defendant had found a letter from the wife of deceased in the coat pocket of defendant. The deceased and his brother went to the place where the defendant was living and inquired about the letter. The wife of the defendant read the letter from the wife of the deceased to the deceased in the presence of defendant and the brother of the deceased. The letter was not introduced in evidence, but the testimony showed that it was mostly an inquiry as to whether the defendant intended to go to the wheat harvest with the deceased. On the back of the letter was written a song entitled "The Lonesome Woman Blues." After the letter was read, the de-

ceased struck the defendant with his fist and the defendant turned and ran. All of this happened near Pauls Valley.

The next day, the deceased and his family moved to Maysville, and commenced living at a camp ground which was occupied by many other laborers who were working in the broom corn harvest. On August 4, 1942, the defendant and one Watson drove into the laborers' camp in Watson's car. Watson got out of the car and inquired for one Walker, who was living at the camp. The defendant remained in the front seat of the car. From that point on, many eye-witnesses of the tragedy saw what occurred and their testimony is substantially the same. They testified that a few minutes after the Watson car drove up, a man by the name of Burl Roberts arrived in his car and talked to the camp leader, a man by the name of Buttes, seeking to hire someone to work for two or three hours on the feeder of a broom corn thresher. The deceased was at the other side of the camp opposite from where the Watson and Roberts cars were parked. The Roberts car was about 30 feet from the Watson car. Buttes, the camp leader, called the deceased over to the Roberts car and talked to him about working for Roberts at the broom corn thresher. The deceased declined the employment, giving as his excuse that his back was bothering him. As the deceased left the Roberts car, he started walking in a direction which would take him by the rear of the Watson car. As he approached the Watson car, the defendant opened the door, jumped out, fired one shot from his pistol which missed the deceased, and, then, fired a second shot which took effect, causing the death of Homer Lail. According to the testimony of the eye-witnesses, the deceased had nothing in his hands and apparently was walking

wholly unaware of the presence of the defendant. When the defendant jumped from the car, the deceased stepped back and held his hands in front of his face and commenced to back up when the defendant started firing. The testimony further showed that a search of the clothing of the deceased disclosed that he did not have any weapons concealed on his clothes or in his pockets.

The testimony of the defendant was that after he had the controversy with Homer Lail, at the home of the defendant in the latter part of June, that he obtained a pistol the following day and had carried it continually since that time for his protection against Homer Lail. That Homer Lail told him, at the time of the altercation in the latter part of June, that he would kill him. That his brother-in-law, Jack Watson, came to visit him on August 3, 1942, and that the next day, he and his brother-in-law decided to drive to Lindsey to see how the broom corn crop was doing. That he did not know that the deceased was in Maysville and had not seen nor heard from him since the altercation a few weeks before that date. That when they arrived in Maysville, his brother-in-law suggested that they drive over to the camp ground and see Mr. Walker. That Watson, the brother-in-law, had borrowed a knife from Mr. Walker and wished to return it to him. That when they arrived at the camp ground, Watson got out of the car to look for Walker, and the defendant remained in the car. That while he was sitting in the car, he heard some one yell, "Homer," and that he looked through the mirror on the windshield and saw Homer Lail come walking out across the camp ground. That he continued to watch the deceased through the mirror. That he saw him approach the Roberts car and heard the conversation concerning the hiring of the deceased. That he saw the deceased approach his car

from the rear and that just as deceased got to the back end of his car, the deceased cursed the defendant and said, "I have come after you." That the deceased had his right hand in his pocket. That when the deceased said, "I have come after you," the defendant pulled his pistol and jumped out of the car. That Homer Lail was coming right at him and he fired one shot in the ground to try to stop him. Then, according to the testimony of the defendant, "He taken another step towards me and I raised it up and shot, and he fell, and that is all there is to it." After the shooting the defendant drove to town with his brother-in-law and surrendered to the officers.

A few days after the incarceration of the defendant, he made application for bail to the district court of Garvin county, which was denied. Subsequently, an application was filed in this court. A transcript of the evidence taken at the preliminary examination, together with that had before the district court of Garvin county, including the testimony of the defendant, was filed in this court. After the hearing, this court rendered its opinion denying bail. Ex parte Hunt, 75 Okla. Cr. 141, 129 P. 2d 208. In that opinion, this court held that the defendant, Ted Hunt, had failed to sustain the burden of showing facts or circumstances tending to justify, excuse, or mitigate the offense. The application for bail was denied.

In Clogston v. State, 34 Okla. Cr. 209, 245 P. 905, it is stated:

"This court is very reluctant to reverse a case for insufficiency of the evidence, and it is only where there is no testimony from which the jury could rationally find the defendant guilty, or where the evidence is of such a weak and inconclusive character, or where the verdict is so manifestly contrary to the evidence as to convince the court that the jury erred in its judgment on the facts,

that a verdict will be set aside for insufficiency of the evidence."

The evidence is sufficient to have sustained a conviction for murder. There is nothing except the testimony of defendant that would in any way show mitigation of the offense. The defendant's testimony as to overt acts by the deceased at the time of the homicide is contrary to all of the other evidence. Since the defendant was not convicted of murder, but only of the crime of manslaughter in the first degree, he certainly is not in a position to complain of the punishment assessed by the jury.

We have given the record a careful examination to see whether there were any fundamental errors committed in the trial which might require this court to reverse the judgment of conviction. The court fully instructed the jury on the law of self-defense. If anything, the instructions which were given were too liberal to the defendant, and it may have been that the liberality of these instructions in defendant's favor was a determining factor in causing the jury to return a verdict of guilty of manslaughter instead of murder. Certainly, under all the facts and circumstances as shown by the record, this court would not be justified in concluding that the punishment assessed the defendant was excessive and the result of passion or prejudice against the defendant. Unless the verdict is clearly excessive under all of the facts, it is not within the province of this court to modify the deliberate action of the jury, which has been approved by the judgment pronounced by the trial court. The case was well tried. The trial court was eminently fair to the defendant. We have found no errors of law occurring during the trial of sufficient importance to require this court to reverse the judgment of the

trial court, and able counsel who represent the defendant have not insisted that there were any such errors.

The judgment of the district court of Garvin county is affirmed.

BAREFOOT, P. J., concurs. DOYLE, J., not participating.